## GEORGE CARTER v. TERRITORY OF NEW MEXICO.

JUDICIAL NOTICE OF HISTORICAL FACTS.—Judicial notice will be taken of public and notorious facts in the history of New Mexico.

RETENTION OF MEXICAN CITIZENSHIP UNDER TREATY.—The declaration of intention to retain the character of Mexican citizens provided for by the treaty of Guadalupe Hidalgo, with respect to Mexican residents of this territory, must be presumed to have been designed to be made according to the laws of naturalization of Mexico, rather than those of the United States.

PUBLIC DECLARATION NECESSARY.—Such declaration of intention could not be made privately, but was necessary to be made before some court, officer, tribunal, or public authority, who should preserve the evidence of it.

GOVERNOR WASHINGTON'S PROCLAMATION ON THIS SUBJECT UNNECESSARY.— The proclamation issued by acting Governor Washington, in April, 1848, was not necessary to enable Mexican residents of the territory to elect to remain Mexican citizens; but in the absence of any such proclamation, a formal declaration of an intention to retain such citizenship made before a court having a record and a clerk to keep the same, would have been sufficient.

SUCH PROCLAMATION AUTHORIZED.—Acting Governor Washington had competent authority, as the representative of the president, and the executive head of the *de facto* government then existing in this territory, to issue such proclamation.

DECLARATION UNDER SUCH PROCLAMATION VALID.—A declaration of an intention to retain Mexican citizenship made and subscribed freely, knowingly, and without fraud or deception, before a probate court, in accordance with Governor Washington's proclamation, was a valid and binding

exercise of the right of election reserved to Mexican residents of the territory, by the eighth article of the treaty of Guadalupe Hidalgo.

PROOF OF DECLARATION INSUFFICIENT, WHEN.—The appearance of the name of a party, proved to be in his own handwriting, subscribed, with others, to a declaration of an intention to retain the character of a Mexican citizen, contained in a book produced from the office of the secretary of the territory, but not shown or certified to have been the record of the probate court of any county, and there being nothing to prove that such list was opened, or kept in pursuance of the proclamation, or that any of the persons whose names are included therein ever appeared before any court or officer, and subscribed such declaration, or as to when or where the names were subscribed, is wholly insufficient evidence of an exercise of the right to elect to remain a Mexican citizen under said treaty.

CERTIFICATE BY DEPUTY CLERK INSUFFICIENT, WHEN.—A certificate signed by one as "deputy" in the name of his principal as clerk of a court is not a sufficient authentication of an official document, it seems, where there is no law authorizing the appointment of a deputy.

CERTIFICATE MUST STATE FACTS.—A clerk's certificate to a list of names appended to a declaration of intention to remain Mexican citizens, that "it is a correct list of all who have elected" in a particular county "to retain the character of Mexican citizens," is insufficient, because it states merely the judgment of the officer and not the facts as to the persons so named having appeared before such officer and subscribed such declaration, etc.

PROOF OF EXECUTIVE PROCLAMATION INSUFFICIENT, WHEN.—The mere production of a copy of an executive proclamation, not certified by any person, without any proof that it was ever published, is insufficient proof of the issuance of such proclamation.

FILING DECLARATION OF NATURALIZATION DOES NOT PROVE ALIENAGE.—The filing of a declaration of intention to become a citizen of the United States by a Mexican who resided in this territory at the date of the treaty of Guadalupe Hidalgo, is not evidence that such Mexican had previously elected to retain his Mexican citizenship under that treaty, where such evidence is offered under a plea in abatement to an indictment found by a grand jury of which such Mexican was foreman.

APPEAL from the district court for Santa Fe county. The opinion states the case.

*M. Ashurst*, for the appellant.

*R. H. Tompkins, attorney-general*, for the appellee.

By Court, BENEDICT, C. J.:

George Carter, at the March term, at Santa Fe, of the first judicial district court, 1858, was indicted for an assault with intent to kill and murder Juan Duro. Upon being ar-

raigned, he pleaded specially "that the territory of New Mexico ought not further to prosecute the said indictment against him, because he saith that Anastacio Sandoval, one of the grand jurors who found the said indictment, was not at the time of finding said indictment a citizen. of the United States, but was at the time of finding said indictment, a citizen of the republic of Mexico, etc. He prayed 'judgment' that he be discharged and dismissed from the premises in said indictment specified."

To this the attorney-general replied generally, and tendered an issue to be tried by a jury, which was joined by the defendant.

This was then tried by a jury, who found the following verdict: "We, the jury, find the issue for the territory in this, that Anastacio Sandoval is a citizen of the United States."

The case was then continued until the next term. When the term came, Carter was duly arraigned, and pleaded not guilty to the indictment. Upon trial, the jury found a verdict of guilty, and fixed his punishment to be the payment of a fine of sixty dollars. Carter's counsel then moved for a new trial, assigning two grounds: 1. "That the jury found against the law and the evidence in the trial of the issue upon the plea in abatement, and also upon the final issue of not guilty." This motion the court overruled, and rendered judgment upon the verdict of the jury against the accused. The counsel then moved in arrest of judgment, because " the jury found against the law and the evidence on the trial of the plea in abatement." This, too, the court overruled, and the defendant excepted, and the court allowed an appeal, and granted him a stay of execution of the sentence.

No testimony appears embodied in the bill of exceptions, other than that given upon the trial of the plea in abatement, and no errors are alleged to have been committed in the district court in this cause, except the overruling of the motion for a new trial and arrest of judgment. Whatever objections might properly be found to exist as to the form of the plea in abatement in attempting to reach the object

320 **CARTER v. TERRITORY.** [Sup. Ct.

Opinion of the Court—Benedict, C. J.

for which it was pleaded, they have all been waived by being replied to and issue joined thereon. It was intended to open the case to the introduction of evidence to prove that Anastacio Sandoval, one of the grand jurors, had retained the character of a Mexican citizen, in pursuance of the eighth article of the treaty of Guadalupe Hidalgo, and thereby established his Mexican citizenship and disqualification to serve as a juror.

The opinion of the court is invoked as to the sufficiency of the evidence to prove these facts on the plea in abatement. Were we disposed to shrink from the heavy responsibilities unavoidably to be assumed in the discussion and decision of this cause, upon the testimony, there are points of practice and technical merits upon which the court might repose, and avoid the examination and adjudication intended to be presented in this appeal. Such shrinking, however, would be unworthy of the independence and dignity of an intelligent tribunal of justice. We may take judicial notice of the public and notorious acts which constituted a portion of the history of New Mexico during the past thirteen years, and in the midst of these the question of the retention of the character of Mexican citizenship has been exciting and disturbing. It is so now, and this fact imposes, in the investigation of this question on its legal merits, the greater labor and care.

The eighth article of the treaty of Guadalupe Hidalgo provides that, " those Mexicans who shall prefer to remain in the said territory (including New Mexico) may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States. But they shall be under the obligation to make their election within one year from the date of ratification of this treaty, and those who shall remain in the said territory after the expiration of that year, without having declared their intention to retain the character of Mexicans, shall be considered to have elected to become citizens of the United States."

It is insisted that Anastacio Sandoval did declare his intention within the one year to retain his Mexican character as to the rights and title of citizenship. To demonstrate

the weight the.testimony in this case gives to the maintenance of this proposition, it is proper to state the most material parts relied upon to show that Sandoval's declaration was legally, personally, and knowingly made; that he did the act in the manner and form allowed by the treaty, and that the proof offered possessed all the essential elements to require the jury so to find, instead of finding as they did.

It was proven by Mr. Jackson, the present secretary of the territory, that at the time he took possession of the books and papers belonging to the office, he found a book, which he produced in court, and which was permitted to be offered to the jury without any objection from the territory, among the archives of the office. The book shown contained the caption in the following words: "We elect to retain the character of Mexican citizens." Below this caption, among other names, was·found the name of Anastacio Sandoval. At the conclusion of the signatures in said book was found a certificate in the words and figures following :

"Territory of New Mexico, County of Santa Fe.

"I, James M. Giddings, clerk of the probate court, do hereby certify, that the foregoing is a true list of all who have elected in said county to retain the character of Mexican citizens. Given under my hand and seal, this first day of June, 1849. (Signed)   JAMES M. GIDDINGS, Clerk,

[SEAL.]   .   "By F. B. Giddings, D. C."

A proclamation was also found in said book, pasted on the lid, containing the words and figures following. This proclamation recited exactly the provisions of the treaty before copied herein, and then continued, but in the Spanish language, and correctly translated as follows:

"Whereas, I, John M. Washington, governor of the territory of New Mexico, do hereby ordain, that the clerks of the probate courts in the different counties of this territory shall immediately open, at the prefectures, records, which shall be headed as follows: 'We elect to retain the character of Mexican citizens;' in which those of each county, who shall so elect may personally record their

names, and those who do not appear and sign said declaration, on or before the thirtieth day of May next, will be, in conformity with the treaty, considered citizens of the United States. Within six days after the thirtieth of May, the record shall be sent, with the certificates of the clerks of the prefectures of the several counties, to the secretary of the territory, that they may be published and distributed to the different tribunals of justice in the territory. Given under my hand and seal, at Santa Fe, the twenty-first day of April, 1848.

(Signed)                                    "J. M. WASHINGTON."

Jesus Sena y Baca testified that he was acquainted with the handwriting and signature of Anastacio Sandoval, and that said signature of Anastacio Sandoval shown him in said book was genuine.

It was also proven, that Anastacio Sandoval, at some previous term of the district court, had, with many others, declared his intention to become a citizen of the United States. It was admitted upon the trial, that Sandoval was foreman of the grand jury that found the indictment against Carter. It is argued that the proclamation of Washington was made without authority of law, and no act done in pursuance of its directions could affect the rights and titles of any one as to his citizenship; that no one, by complying with its provisions, could secure the retention of the character of Mexican citizen, solemnly guaranteed to every Mexican in New Mexico by a treaty between the nations having full power over the subject-matter. Now that part of the treaty cited was one of the provisions and covenants made in favor of Mexico and her citizens. A war had been waged between the two republics, disastrous at all points to Mexico, until the success and power of the United States seemed threatening the very existence of Mexico as a nation. It was then the treaty was concluded. This dismembered the Mexican republic, and one portion cut off from the nation was New Mexico, which had been conquered by the troops of the United States in 1846.

In this region there was a large number of native-born Mexican citizens. In the cession made, few, perhaps, are

aware how deeply the Mexican government felt in insisting upon a treaty stipulation that should secure to those citizens, beyond cavil or dispute, the right to retain their Mexican citizenship, should they prefer to do so, in preference to becoming citizens of the United States. The movements of a portion of these people in what is known as the Taos "insurrection" against the United States authority and government seems to have drawn towards these inhabitants strong professions of sympathy from the Mexican government. During the discussion between the commissioners, on the part of the two nations, as to the provisions the treaty should contain, a liberal council was held by the Mexican government, which resulted in giving to the Mexican commissioners a new body of instructions, which were imparted in form by Secretary Pacheco, in a communication at Mexico, September 5, 1857: See executive documents, No. 52, thirtieth congress, first session.

These instructions express the extreme unwillingness to cede this territory by Mexico. They say that even should congress approve, the government would not consent to cede New Mexico, whose inhabitants (we quote the exact lanluage) "have manifested their will, to make a part of the Mexican family with more enthusiasm than any other part of the republic. Those well-deserving Mexicans were abandoned to their fate, very frequently without protection, not even shielded from the incursions of the savages; yet, notwithstanding all this, they have been the truest Mexicans, and most faithful patriots. Forgetting their private grievances, they at this time remember only that they are and wish to belong to the Mexican family, exposing themselves to be sacrificed to the vengeance of their invaders, against whom they have risen. When their plans were discovered, their conspiracies frustrated, they have not ceased to conspire. Could the government go to sell Mexicans like these as they would a herd of sheep? No! Before the nationality of the rest of the republic shall be lost to them we will perish together.

"In New Mexico, and the few leagues that divide the right bank of the Nueces from the left bank of the Bravo,

is contained either peace or war. If the commissioner of the United States leaves nothing else to the government of Mexico, than to choose between this cession and death, in vain was he sent by his government."

The American commissioner writing to our own government, under date of September 4, 1847, from Yacubayo, says upon this same subject of ceding New Mexico: " Both honor and interest, they say, forbid them to surrender it. They could not without ignoring ' sell ' a portion of the population of the country, who have given such striking proofs of fidelity to the republic, and of their determination to retain the character of Mexican citizens. On the other hand, interest required them to hold on to that part of the republic, as one of its main dependencies for meat to feed its inhabitants. Upon the grounds set forth in considerable detail rested the special objection to parting with New Mexico."

In the effort between the two countries to establish peace, the Mexican government offered a project which included territory claimed by them as before then belonging to Mexico. In this they insisted that, " if the persons here treated of think proper to remain in the territories they now inhabit, they may preserve the titles and rights of Mexican citizens, or at once acquire the titles and rights of citizens of the United States if they wish."

The stipulation finally adopted was such as the eighth article contains. The right to preserve the Mexican character was guaranteed, but the obligation to make the election was limited to one year. We now see with what tenacity the Mexican government insisted upon, and finally obtained, the agreements in favor of Mexicans in the ceded territory, embraced in the article before cited.

It has not remained for this court to urge the sanctity and inviolability of treaties. Every increased spread of light in the world of civilization has given renewed vigor and sanction to all lawful agreements between man and man and nation and nation. Good faith in these regards is among the highest distinguishing traits that make and fix the moral character, rank, and honor of individuals in commu-

nities.   To no nation is strict observance of covenants and
agreements of so high importance as to the United States,
whose very existence depends upon the mental and moral
consent and the deliberate formal agreements of the parties
interested in the formation and continuance of the system
which made them a nation among the powers of the earth.
It is not for a government whose exalted tone and sense of
constitutional justice has restrained each and all of the
states of the great union from ever passing any law that
shall impair the obligation of a contract, and has made her
treaties a part of the supreme law of the land, to disregard
her solemn promises and engagements, though made to the
weak, ill-governed, and distracted nation of Mexico.

But it is urged with much zeal, and apparent conviction
of the soundness of the view, that although the treaty did
secure to the Mexican citizens of the ceded territories the
unqualified right to retain their Mexican rights and titles
within one year, still the treaty failed to prescribe the form
and manner by the observance of which such citizens could
avail themselves of the stipulations in their favor, and as
congress passed no act in aid of such persons, and defined
no special form by means of which they could declare their
intentions, they remained wholly without remedy, and the
portion of the eighth article in their favor became without
effect, a dead letter among the supreme laws of the land,
and void as to any power to retain rights under its provisions.

Now, all the Mexicans contemplated had to make their
election to either retain the character of Mexicans or ac-
quire that of citizens of the United States.   The former
had to perform a positive act to make their election, while
the latter might make their election by remaining passive
and doing no positive act touching such election during one
year, and this passiveness was declared to be evidence that
they had chosen to be citizens of the United States.   When
such non-action was to be proof of the solemn act of chang-
ing allegiance and citizenship on the one part, was the
other party left without remedy or compelled to seek it
through some modified declaration under oath analogous to
that provided in our naturalization laws?   I think not.

True that the treaty uses the phrase "declared their intention." From this it has been sought to maintain that this language, if intended to refer to any form of election, must be construed to adopt the manner of declaration of intention of citizenship prescribed for aliens by our laws. Those who advanced this opinion seem to lose sight of the fact that two independent nations were forming that treaty, and that both adopted the language referred to. It is no more to be held that the stipulating parties intended to mean the adoption of our legal signification of a declaration of intention of citizenship, and our oath upon that subject, than that to the exclusion of our laws, and statutory and legal terms; the parties intended what the laws of Mexico meant by the like phraseology in her naturalization laws. Although the contracting powers stood equal, yet as the stipulation was to inure in favor of Mexico and her citizens, the presumption is much stronger that her statutory meaning was to prevail, than that ours should become the only rule.

A reference to the Mexican rules for giving letters of naturalization, as contained in the appendix to Schmidt's Civil Law of Spain and Mexico, will throw more light upon the sense in which declaration of intention was understood in Mexico when used in connection with citizenship. Article 2 directs the mode the applicant must proceed to obtain letters of naturalization. Article 3 then declares that whoever "wishes to be naturalized must also present one year beforehand a petition in writing to the *ayuntamiento* of the place where he resides, explaining his intention of establishing himself in the country. Proof of such declaration must accompany the documents spoken of in the following article."

There is clearly expressed what was a declaration of intention of establishing one's self in Mexican country, and this was a preparatory step in the course of acquiring Mexican citizenship. It could be done simply in writing before the *ayuntamiento* or incorporated authorities of the village, town, or city where the applicant resided, and one year before he could apply for his letters. It is a fair presumption that the election given to Mexicans was to be made in the terri-

tories ceded by the treaty. It was by their continuance upon the soil that, passively, one party was to choose allegiance; the other, by a positive act, was to choose to remain in allegiance to the Mexican republic. The impracticability of going beyond the territories to seek the authorities of either power before whom the declaration could be made was at once apparent. Now, each power must be presumed to have formed the treaty in full view and recognition of the fixed and universal laws of nations. They knew that the governments found to exist *de facto* within the ceded countries at the ratification of the treaty must continue to exist *de jure* until changed by the legislative power of the United States. The government of the United States observed and enforced the mentioned rule throughout the countries that cession had confirmed to it, from the moment the treaty went into effect down to the establishment of governments by congress' final enactments. This court has repeatedly announced and enforced the same doctrine, and the supreme court of the United States has, in many instances, given the highest sanction known to our judicial system, to the law that all civilized and enlightened nations observe.

Mexico, then, knew that public authorities, magistrates, and courts were established and in the full exercise of their powers and duties, throughout those territories, and that they must continue. Mexico bound the United States to respect inviolably the property of every kind belonging to Mexicans established in those countries. The United States, also, became bound as to those Mexicans who should not preserve the character of citizens of the Mexican republic, that they should be "maintained and protected in the enjoyment of their liberty, their property, and the civil rights then vested in them, according to the Mexican laws." To fulfill these obligations, courts, magistrates, etc., were absolutely indispensable, and must exist.

Having now, we think, sufficiently shown that public authorities, before whom the declaration might be made, were anticipated by the parties to the treaty, we pause to inquire what act would have amounted to the declaration in-

tended.  This matter is not without previous adjudication
in this court.  At the January term, 1853, this very ques-
tion was presented and determined in the case of *Quintana*
v. *Tompkins*.  The court used this language in their opin-
ion: "As no mode had been prescribed, and no particular
species of evidence required, it was an act that might have
been performed in any sufficient manner and form, like any
other disputed fact, by the best evidence of which the nature
of the case admitted."

This was undoubtedly correct.  It was an act that might
have been performed in any sufficient manner.  Such
might be said with equal justice of all lawful acts suscep-
tible of being performed under our laws.  No one will
question that where such acts are sufficiently performed,
they are done; nor is the proposition to be controverted,
that the act alluded to, when done, might be proven by the
"best evidence of which the nature of the case admitted."
The rule here asserted is one of the universal rules of evi-
dence, and we know of nothing in the treaty which has
changed its practical force.  From the language quoted,
we get no tangible, definite idea as to what constituted a
sufficient manner.  The court failed to give any clear defi-
nition of what it would have considered such manner,
though it held in the same opinion that "various modes of
making the election might have been adopted."  In that
case, it was proven that Quintana was seen to sign his
name "in the book," and that afterwards in conversations
he stated that he was a Mexican citizen.  The court held
that the declaration was sufficiently proven, and that Quin-
tana was a Mexican citizen.

Here, then, is a decision of this court, formerly made,
that the election under the treaty could be and was made
in this territory, and up to this time that decision has never
been overruled by this bench.  It, then, stands as the law
upon that subject to all other tribunals in the territory,
and must so stand until this court shall otherwise adjudge.

It is said in argument, that the declaration might have
been bindingly made in whatever mode the person himself
might select, provided it manifested the intention within

the mind of the party to retain the Mexican character. To this proposition we can not yield assent. Those who would avail themselves of the privilege granted were expected generally to remain within the territory. Their selection would deprive them of none of the most precious political rights and privileges within the land of their birth and homes. In the contests incident to a free government, to which the Mexicans were going to be introduced by the treaty, some mode, certain and permanent in proof, and beyond any mere oral testimony, surely must have been intended to be observed in the act of retention. It must have been done in such modes that the frailty of the testimony could not momentarily imperil the rights of citizenship. In our government, and also in the Mexican, as has been shown, no declaration concerning citizenship could be made without the aid and presence of some public authority. Varied as were the forms in both governments, there was one element ever present and universal, and without which no such declaration in any form was known to our laws. This was some court, magistrate, or council, that should receive the declaration, and preserve the imperishable evidence of the act. Neither government ever trusted to memory the preservation of so solemn an act as that of the assumption of allegiance; an unchanging, an undying record was ever required.

The Romans were not the only people that have lived, whose sons, by the simple utterance that they were "Roman citizens," averted danger and commanded protection in whatsoever country they might wander, from interest or pleasure. Modern powers follow their citizens or subjects whithersoever they may lawfully go, and an injury to them by any foreign government is an injury to the government where the allegiance is rendered. It was the principle involved in this practice, that but recently equipped the formidable naval expedition that frowned upon the waters of La Plata, until redress was perfected for the wrongs done to the citizens of our republic. The power of Great Britain sends her battle ships wheresoever the keel can part the waves, and threatens with her cannon whatever people

or government wantonly outrages him who bears with him the attributes and tests of being a British subject.

The inhabitants of this territory, in numbers, with heavy merchant trains, yearly enter and traverse the Mexican states, making large purchases at the fair at San Juan, at the capital at Durango, and in Guadalajara. They seldom make their trips without moving amidst revolution upon revolution, raised and effected by the various factions that spread distraction, insecurity, and ruin throughout the land. What safety have these traders aside from their character as citizens of the United States? Should they be known as persons from this country, who had retained the character of Mexicans, and owing allegiance to that government of their birth and election, what would save them from all the outrages, afflictions, and losses which the Mexican authorities of the hour might resolve to practice? Let the extent, be what it might, how could the victim appeal to our government to redress them? Could the idea ever for a moment be tolerated, that the trader might be followed by his ruthless, deadly enemy, who, upon declaring that he has heard the merchant say in a private conversation at a hotel, upon the corner of a street, in a crowd, or while journeying upon the highway, in the workshop, or field, or elsewhere, that he intended to retain his Mexican character, and such should be received in Mexico as proof of such retention, and subject the pursued and persecuted to all the horrors the Mexican authorities might inflict? Can it be supposed that proof of such an act, even though the witness be wholly unblackened with perjury, would be sufficient to establish the declaration mentioned in the treaty, and fulfill the intents of the contracting powers? Are the rights of one who changed his allegiance to the United States to be so easily periled, should he be found, with his interests with him, within the limits of the Mexican states?

We come now to the proclamation found upon the lid of the book, and which in argument is conceded to be a true copy of the one issued by Colonel Washington, at the same time exercising the powers of civil governor in New Mexico by virtue of his being the then military commandant of the

United States in this region.   To the objections so persist-
ently urged that he had no authority to make such procla-
mation, we answer that no such act was needed or required
to enable the Mexicans to make their election within the
year.   Their right was already full and perfect, and their
means ample and complete.   They had only to appear be-
fore some court then existing within the district or counties,
and having a record with a clerk bound by law to keep the
same, and to truly record all of the proceedings of such court,
or before the clerk in his official capacity, with his record,
and in writing make the formal declaration.   The right to
do this could not be given by the acting governor, nor could
he take it away.   It existed independent of him, and this
he doubtless well knew.   Indeed, he had no purpose of
speaking into life a new right, but to aid the inhabitants in
the proper enjoyment of what was already in their hands.

   It is incumbent at this point, in order to a full understand-
ing of this whole question, to inquire what position Colonel
Washingtion then occupied towards the government of New
Mexico and the execution of her laws.   When war existed
between Mexico and the United States, the president, as
commander-in-chief, sent General Kearny, with a military
command, to make conquest of this country.   In the instruc-
tions given he was told: "Should you conquer and take pos-
session of New Mexico, and Upper California, or consider-
able places in either, you will establish temporary civil
governments therein."   We need not say that the conquest
was made and the temporary civil governments established.

   On the eleventh of January, 1847, Mr. Marcy, secretary
of war, writes to General Kearny, approving of the civil
government and laws "established for the government of
the territory of New Mexico," except such portions as pro-
posed "to confer upon the people political rights, under
the constitution of the United States."   These the president
disapproved, and directed they should not be carried into
effect.   It is added: "Under the laws of nations, the
power conquering a territory or country has the right to
establish a civil government within the same, as a measure
of securing the conquest, and with a view of protecting the

persons and property of the people, and it is not intended to limit you in the full exercise of this authority."

Under the same date, the president, through the secretary of the navy, wrote to Commodore Stockton, who had been invested "with the direction of the operations on land, and with the administrative functions of government over the people and territory occupied by us, in California," "that the course of our government in regard to California, or other portions of the territory of Mexico now or hereafter to be in our possession by conquest, depends on those on whom the constitution imposes the duty of making and carrying treaties into effect. Pending the war, our possessions give us only such rights as the laws of nations recognize, and the government is military, performing such civil duties as are necessary to the full enjoyment of the advantages resulting from the conquest, and to the due protection of the rights of persons, and of property of the inhabitants."

Also, under the same date, the secretary wrote to Colonel Price, the officer commanding the United States forces at Santa Fe, New Mexico: "The temporary civil government in New Mexico results from the conquest of the country. It derives its existence directly from the laws of congress or the constitution of the United States, and the president can not, in any other character than that of commander-in-chief, exercise any control over it. It was first established in New Mexico by the officer at the head of the military force sent to conquer that country under general instructions contained in the communication from this department of the third of June, 1846. Beyond such general instructions the president has declined to interfere with the management of the civil affairs in this territory. The powers and authority possessed by General Kearny when in New Mexico were devolved on you as the senior military officer on his departure from that country. They are ample in relation to all matters presented to the consideration of the president in the communication of the acting governor, Vigil, dated the twenty-third of March last, and to you, as the senior military officer, he will leave such matters, without positive or special directions.

"It appears from the letter of the acting governor of New Mexico, of the sixteenth of February, that he wishes to withdraw from the duties of that post, and only holds it until the president shall appoint a successor. On this subject, I am directed to say, that the filling of this office appertains to the senior military officer, to whom the temporary civil officer is subordinate. Should the present incumbent wish to retire from that office, you or the senior military officer in New Mexico, if convenient or necessary to delegate the power, will select such person as you or he may deem best qualified to exercise the functions of that situation, and duly invest him with them."

At the like date the president directed General Kearny, in California, that upon his return the functions of civil government would devolve upon the officer of the army next in rank to himself, or on such officer of the army as may be highest in rank for the time being. "It is not intended by what is said before, in regard to the functions of the temporary civil government being in the officer of the army highest in rank, to deny or question his right to invest any other person with the powers and duties of temporary civil governor, should such officer find it inexpedient or inconvenient to exercise these powers and perform these duties in person; but in case of such delegation of the functions of temporary civil government, the person exercising them must be subordinate to the commander of the land forces, and removable at his will. The responsibility as to the military and civil officers rests with the officer in chief command of the military force."

It is settled throughout all branches of our government, that the president, as commander-in-chief during the war, had full power and authority to organize and set up the forms and rules of government, which, in pursuance of his orders and will, were ordained in New Mexico and California. That form was "military," and the functions of civil governor were reposed in the military commander for the time being. He was empowered to delegate his functions to another person, should he find it convenient or expedient to do so, as was done to Governors Bent and Vigil in this

territory. Such was the form of government found here at the ratification of the treaty. Under date of December 10, 1848, the president, through the secretary of war, Mr. Marcy, writes to Major-General Worth: "The situation of the people of New Mexico is similar to that of the people of California. The views of the government, as presented in the letter of the secretary of state, you will regard as applicable to the inhabitants of New Mexico, and take the proper measures to make them known in that territory."

That letter was written by Mr. Buchanan, now president of the United States, and says: "By the conclusion of the treaty of peace, the military government which was established over them under the laws of war, as recognized by the practice of all civilized nations, has ceased to derive its authority from this source of power; but is there, for this reason, no government in California? Are life, liberty, and property under the protection of no authorities? Fortunately, they are not reduced to this sad condition. The termination of the war left an existing government, or government de facto, in full operation, and this will continue with the presumed consent of the people, until congress shall provide for them a territorial government. The great law of necessity justifies this conclusion. The consent of the people is irresistibly enforced, from the fact that no civilized people could possibly desire to abrogate an existing government, when the alternative presented would be to place them in a state of anarchy beyond the protection of all law, and reduce them to the unhappy necessity of submitting to the dominion of the strongest." October 12, 1848, the secretary of war says to the officer commanding the forces at Santa Fe: "Whatever civil government is found to exist, is to be regarded as a government de facto, and also to be respected. Until a territorial government shall be provided by congress, things must remain as they are. It will be the duty of the military authority there to defend the territory from invasions, to repress and repel Indian incursions, and preserve internal tranquillity. The important duty of the military force will be to protect the inhabitants of the territory of New Mexico, in the full enjoyment of life, liberty,

and property. The views of the executive, in relation to the civil authority, and the collection of revenue, you will understand from a copy of a letter from the state department, written with particular reference to the people of California."

We will now show what sanction the supreme court of the United States has given to the various orders and instructions. In the case of *Cross et al.* v. *Harrison,* 16 How. 164, the court quote largely from the letter of Mr. Buchanan, and affirm the principles announced. They refer to the orders of the. president, made through the secretaries, and say: "None can doubt that those orders of the president, and the action of our army and navy commanders · in California, in conformity with them, was according to the law of arms, and the right of conquest, or that they were operative until the ratification and exchange of a treaty of peace. It will certainly not be denied that those instructions were binding upon those who administered the civil government in California."

Again: "The government of which Colonel Mason was the executive, had its origin in the lawful exercise of a belligerent over a conquered territory. It had been instituted during the war by the command of the president of the United States. It was the government when the territory was ceded as a conquest, and it did not cease, as a matter of course, or as a necessary consequence of the restoration of peace. The president might have dissolved it by withdrawing the army and navy officers who administered it, but he did not do so. Congress could have · put an end to it, but that was not done. The inference from the inaction of both, is, that it was meant to be continued until it had been legislatively changed. No presumption of a contrary intention can be made."

We have made these large extracts from so many of the highest authorities in order to demonstrate the more clearly the nature of the executive in this territory from the time of the conquest by arms up to the ratification of the treaty, and from that period down to the institution of a territorial government by the act of September 9, 1850. The gov-

ernments founded at the treaty continued *de facto*, and the executive functions of civil affairs remained in the hands of the senior officer in military command. He was, so to speak, *ex officio* civil governor, and authorized to perform all the necessary acts belonging to the executive power within the territory.

We will now be able to show such authoritative relation as Colonel Washington had in making a proclamation to the Mexicans in New Mexico, in regard to their retaining the character of Mexicans. A proclamation is defined by the English law writers to be "a notice publicly given of anything whereby the king thinks fit to advertise his subjects:" 3 Tomlin's Law Dict. 236. To give it a definition corresponding to our political system, it is a notice publicly given of anything whereof the executive thinks fit to inform and notify the people; it is a publication by authority; an official notice given to the public.

We will now inquire if such a state of things existed in this territory, that such a proclamation was needed to emanate from the executive, to preserve the ₌public peace and tranquillity, and our public honor and good faith in the fulfillment of our duties under the treaty. We find the highest evidence of what the president expected of the officers in command, in his letter of instructions dated April 3, 1849, to General Smith, commanding the Pacific division. He says: "The defense of the territory against foreign invasion, and the preservation of internal tranquillity, from civil commotion, will be objects of your care, and may require the exercise of your authority. The duty of regarding the obligations of the treaty lately concluded with the republic of Mexico, is now superadded; especially those provisions which relate to the time when the resident Mexicans are required to make their election of citizenship, and others who may choose to remove with their property beyond the limits of the United States into Mexico."

We scarcely need say that the same duty as specified in these instructions, in its fullest force, was upon the officer commanding in New Mexico on the nineteenth of August, 1848. The Mexican congress, by a decree, authorized the

appointment of a commission to proceed to New Mexico and aid such Mexicans as should not prefer to acquire the character of citizens of the United States, to emigrate to the Mexican republic. On the sixth of September following, the president of Mexico appointed and commissioned Ramon Ortiz, a priest, to execute the instructions of the decree. In due time he arrived in this territory. What followed is a part of the public history of New Mexico. Of this the court may take notice. It may refer to the safest sources of information to know the events of that period. So far as a knowledge of these is essential to the consideration of the matters under consideration, none can be more reliable than the written relation of the honorable Joab Houghton, who, from the conquest of the country down to the induction of the territorial government, occupied the position of chief justice of the supreme court and circuit judge, and must have had full knowledge of all the movements resulting from the entrance of Ortiz among the Mexicans, and his promises to and deportment with them. The records of the executive proceedings of that time will also assist in the inquiry we are now making. After reaching Santa Fe, the commissioner journeyed through some of the counties, and, to use the language contained in the narrative of Judge Houghton, produced a great excitement among the people, inducing a large portion of the inhabitants of those counties not only to declare themselves as retaining the character of Mexican citizens and their readiness at once to emigrate, but excited them to acts of disturbance and disregard of the then existing authorities. In fact, as it then appeared to both civil and military authorities, an open rebellion was threatened in consequence of the course taken by the commissioner: See executive records sustaining the truth of Houghton's statement.

So great was the commotion, that Governor Washington became alarmed for the public tranquillity, and ordered the commissioner to return to Santa Fe, and no longer communicate with the people personally, but put at his disposal the press of the city, by which he could issue his notices or proclamations. That course for a time allayed

the excitement.  The administration, however, of the territorial government found itself greatly embarrassed.  It found in some of the counties the officials, such as the prefects, alcaldes, sheriffs, etc., insisting that they had declared to the commissioner their intention to retain the character of Mexican citizens.  Many influential Mexicans were seeking some public mode of declaring their intentions.  Under such condition of affairs, Washington, the commanding officer, published his proclamation.

In direct view of such a state of facts, well authenticated, and the obligations under which Colonel Washington held his command, and his powers as governor, to take care and preserve the internal tranquillity of the territory from civil commotion, and his superadded duty to regard the obligations of the treaty, especially those provisions which related to the time when the resident Mexicans were required to make their election of citizenship; who, in view of all this, will still assert that the proclamation was published without authority, and was without any meritorious effect upon the matter to which it related?  It was now after the peace confirming the conquest, in the midst of all the hatred and bitterness against Americans and the United States, which the conquest and its consequences had engendered among a people foreign in language, laws, customs, and religion, with the pride of kindred and race peculiar to all Spanish races, in the midst of those who had lately, as the Mexican cabinet council said, "risen against the government and the American name and blood in the country," and when risen, whose steps and deeds were marked with murder, robbery, and fiendish atrocity in the village of Taos, and who, as the counsel assert, though "their plans were discovered and disconcerted, their conspiracies frustrated, did not cease to conspire." A popular, powerful, and well-known priest, clothed with a commission from the Mexican government, though dismembered and humiliated, was exciting the prejudices of the people, already hostile to the new government, offering bounties to those who would reject allegiance, and payment of expenses to them upon their emigration.

A failure upon the part of congress to establish a territorial government had kept the doors closed against the ambitious struggles for distinction, preferment, and power, of the most intellectual, instructed, and talented.    Their hopes that they would be relieved from the military rule and government had been disappointed.  They were in much despair as to the future.  They were seeking to know the most proper means of cutting themselves fairly loose from all allegiance to the United States, to abide the fortunes of their ill-fated mother republic.

Now, under the treaty they might make sure a right they and Mexico so much valued.  It is rare in the United States that an executive finds himself surrounded by more exciting and critical circumstances than those presented to Colonel Washington.  It was absolutely necessary to obtain some certain legal tests that would designate those persons of Mexican allegiance.  It was the imperious duty of Washington to allay the increasing excitement and tranquilize the inhabitants.  It was incumbent on him more than upon any one else, to inform the ignorance of the population of the easy and lawful mode by which they could declare their intentions, and retain their Mexican citizenship.  He was the power to call the excited Mexicans to pause, to consult more calmly and wisely their true interest, and let reason and judgment assume the control of passions and prejudices in the selection to be made between Mexico and the United States.

He was equal to his duty and the occasion.  By withdrawing the priest from among the inhabitants and issuing his proclamation, he attained, as far as the time would permit, the desired results.  The people were informed that they were only to personally appear at the different prefecturas, or prefect's offices, in the counties, and in proper form record their names to retain their Mexican citizenship under the treaty.  The disturbed state of the public mind calmed itself.  A second thought convinced many of the impolicy of casting their own and their children's fortunes with Mexico.  The commissioner was shorn of his power to deceive his Mexican friends, and do evil to the United States.  Those who desired availed themselves of

the modes the proclamation had declared to retain their Mexican character. We have arrived at the point to announce unhesitatingly, with a clear conviction, that those who did make their election in the manner and form pointed out in the proclamation, with a knowledge of their act, and without being the victims of fraud or violence, did preserve to themselves the right guaranteed in the eighth article of the treaty, and to the fullest extent the character of Mexican citizens; that they did voluntarily reject and refuse the citizenship of the United States, and retain that of Mexico.

In examining the questions connected with the proclamation, we do so as they were presented to the jury for their finding on the trial of the plea as the evidence stood, but as the facts have been conceded to exist in the arguments before this court, the force of the testimony that went to the jury we will examine before this opinion closes. We think it not foreign to the inquiries we have made, to see what sanction or ratification the government of the United States implied or expressly gave to the act of Colonel Washington, and the rights which Mexican citizens perfected in the mode by him directed. At no time do we find that the president or congress disapproved the proclamation. From the moment that the proof appeared that a Mexican had elected to retain his Mexican character in due form in the prefecture, he was excluded from all places and share in the administration of the laws of the territory. He was turned from a seat as juror, and deprived of his functions as a local or county officer, and this exclusion remained, up to the establishment of a territorial government.

By searching, we can find no other test applied than having made the declaration in the place and manner required or pointed out in the proclamation. Congress, in giving an organic act to New Mexico, expressly said, "that the right of suffrage, and of holding office, shall be exercised only by citizens of the United States, including those recognized as citizens by the treaty with the republic of Mexico, concluded February 2, 1848." In this, congress clearly intended to draw a distinction as to the ineligibility to office and voting

of those who had preserved their Mexican character. It is implied in the provision that congress knew that a class of men were here who were not recognized as citizens by the treaty. It must be presumed to have known the elements about which and for which it was legislating, and adopted the language to show the intents of the section alluded to. Throughout the whole territory a body of men were recognized for nearly two years and a half before the organic act, by themselves, the official authorities, and the entire mass of inhabitants, as not being citizens of the United States, because they had recorded their names in the records of the prefect as retaining the rights and titles of Mexican citizens. If congress did not mean those men in the provisions quoted, and thereby give full sanction and effect to the means by which they had reserved their character, and to the proclamation of Governor Washington, who, then, were meant by that language; or could it have been idly written in the statute giving a government?

Out of the treaty arose a difficulty or misunderstanding as to the true boundary between the two republics. This is familiarly known among us in New Mexico as the "Mesilla question." It portended for a time another war between the nations. A new treaty, however, settled the strife. This treaty endeavored to adjust all the preceding difficulties between the powers. It is not to be supposed that Mexico did not know in what manner the United States had fulfilled her stipulations upon Mexicans in New Mexico. Her commissioner, Ortiz, had fully reported to his government the result of his mission. Among the various grounds of complaint between the negotiators, none was offered by Mexico that the United States had enacted no law, no means by which the Mexicans could evidence their intentions of the character of Mexicans. What is known as the "Gadsden purchase," with her people, were to be ceded to our government. It does not seem to have occurred to either party that the new treaty should and ought to specify the mode in detail by which the Mexicans of that purchase might retain the character of Mexican citizens. This treaty was concluded on the thirtieth day of December, 1853.

It is worthy of observance, that in this was adopted and ratified the identical article 8, contained in the treaty of Guadalupe Hidalgo. It is done in article 5 in these words: "All the provisions of the eighth, ninth, sixteenth, and seventeenth articles of the treaty of Guadalupe Hidalgo shall apply to the territory ceded by the Mexican republic, in the first article of the present treaty, and to all the rights of persons and property, both civil and ecclesiastical, within the same, as fully and effectually as if the said articles were herein again recited and set forth."

With the thorough knowledge both powers must have had, it is fair to presume that they were well satisfied with the interpretation which had been given to the eighth article in New Mexico, and the manner of electing allegiance; and that further stipulation was required to secure Mexican rights. If this be correct, then we have the solemn sanction which a treaty, a portion of the supreme law of the land, impliedly imparts to the action of Governor Washington, and the mode in which Mexican citizenship was retained.

We deem it proper here to notice what has been some of the legislation of New Mexico as to the right of voting and holding office. The first session of the general assembly, under the organic act, was held in July, 1851. This is often referred to as being distinguished for the ability and high standing of its members in the territory. In enacting an election law, they enacted that "no person prevented by the organic law of the territory should be entitled to vote or hold public office." And further: "If any Mexican citizen prevented from voting by any of the provisions of this act, shall vote at any election hereafter held in the territory, on being convicted, he shall be sentenced to a fine of not exceeding five hundred dollars, or to be imprisoned for a term not exceeding one year:" See Rev. Code.

Those provisions have never been repealed. They remain this day in force. From "Mexican citizens" only being included, it is evident that the legislature had in view those who had retained that character; and intended to rigidly restrain them from the enjoyment of a privilege belonging only to citizens of the United States. Having

occupied so much space in the investigation of the matters which have arisen in this case,. before entering upon the last point to be considered, we will indulge the remark, that few questions of more personal importance to many, and general importance to all, can arise in New Mexico, than that we have been discussing, and about which we have announced conclusions.   To be a subject under a despotism is to be naked of political rights.   To be a citizen of the United States in New Mexico, elevates the man to being virtually his own legislator.   This is a position not to be lightly esteemed.   This great right should not be trifled with by those who enjoy it.   Those who knowingly and willfully pushed it aside or trampled it under their feet, after the treaty offered it to their hands, must place to their own charge their great loss.   They should have estimated more justly the strength, progress, and justice of the government inviting their allegiance.   It is but truth and justice to say that many of those reputed to have made their election adverse to the United States, are among the men of the highest standing, for intelligence, worth, and patriotism, in the territory.

As deeply as we may regret this citizen condition, still it is one of their own seeking, and from which they have a mode of extrication.   The pathway of the bench is where the law and duty leads them.   They are not to suffer their ears to be corrupted by the whispers that there are those who have personal political interests involved in this question.   The breath of the demagogue, whose odor is always filthy to the upright, just, and strong spirit, is inconceivably so, when attempted to be suffused towards the tribunal of justice.   It is no part of the duty of these tribunals to ravish men into the rights of citizenship of the United States, who, in an evil hour, mocked at the privileges offered, and are as yet refusing to avail themselves of our naturalization laws.   If outside of them relief is to be found, other branches of the government must give it, and not the judicial, however gladly an individual judge might interpret an act lessening the disabilities under which the elected Mexican citizen labors.

We come now to the sufficiency of the testimony, as it appears upon the record, to maintain the plea in abatement, and establish Sandoval's "Mexican character" in conformity with the principles laid down. No parol evidence seems to have been introduced to explain how the book originated, how and by whom it was kept, or where, when, or before whom the signatures were recorded. If the book had been one of the records kept in the prefect's court or pertained to his official duties, and kept by the clerk, there is no certificate showing that the persons whose names are found in the list following the caption, had been before him or the prefect's court and recorded their names. If the book is the one kept and opened in pursuance of the proclamation of Washington, in the office of the prefect of Santa Fe, no witness proved the fact, and no certificate of the clerk shows it. No law existed authorizing the prefect's clerk to appoint a deputy who, in the name of the principal, could authenticate books, papers, or documents, or give faith or validity to a certificate; and even should it be admitted that such appointment could be made without legislative authority, the certificate does not show that Giddings, the principal, was clerk of the prefect's court "for the county of Santa Fe," but only that he was "clerk of the prefect's court." Also it states that the foregoing is a correct list "of all who have elected in said county (Santa Fe) to retain the character of Mexican citizens." In this, the clerk's pretended deputy certifies his judgment instead of showing the acts done and the facts in conformity with the proclamation. He fails to inform us whether the persons named in the list recorded their own names, or whether it was a list of persons merely that in the county had retained a certain character. True, Sandoval's signature was proven, but there was no proof when, or where, or under what circumstances he wrote it, or that he did it in the presence of any court, magistrate, or other official authority having the attributes to receive and authenticate the declaration when made.

As to the proclamation found upon the book, the jury have no proof before them that it had ever been published

by Governor Washington—neither how, when, nor where. The attorney-general, though he seems with a liberal spirit not to have objected that the defendant should have the benefit of the book and what it contained before the jury for what it was worth, it does not appear that he made any admissions to supply the utter weakness and insufficiency of the evidence to prove the issue for the defense. It was proven that at some previous term of the court, Sandoval had declared his intention to renounce Mexico and become a citizen of the United States. It must be borne in mind that the whole effort of the defense was to prove that Sandoval's Mexican citizenship resulted from his having elected to retain it under the treaty. If he was a resident of this territory, as was apparent at the time of the ratification of the treaty, and has so remained, and did not elect in favor of Mexico, then, with this explanation, neither one nor a hundred declarations of intention in the district court would prove him a Mexican citizen, in fact and law. With such residence, the presumptions would be in favor of his citizenship to the United States, nor should he lose it or be deprived of it without the clearest proof. He may not have known his rights, or mistaken them, and had a fancy to make them doubly secure. The date at which he did that act, as it seems jointly with fifteen others, does not appear, but it is shown by the record that it was some time during the judicial administration of Chief Justice Deavenport. Sandoval was not defending his own rights of citizenship on the trial, and it is but a reasonable inference that he had perfected his naturalization, even if such in law be needed. A plea in abatement should not only be well pleaded, but well proved also. The evidence was wholly insufficient to authorize the jury to find in the defendant's favor. They found rightly for the territory.

We shall not discuss the effect of the defendant's not moving for a new trial upon that finding until after he pleaded the general issue of not guilty, went to trial and was convicted. Exceptions appear to the action of the court on that trial. No other conclusion, then, can here be drawn, than that the trial was correctly had, and the defendant

fairly and justly convicted. The court properly overruled the motion made in his favor after the trial.

We take pleasure in acknowledging the legal ability with which this cause was argued by counsel on both sides. As to the weight of the testimony, the arguments were exhaustive.

It is the unanimous opinion of this court that the judgment of the district court be affirmed.

Affirmed with costs.

Separate opinion by BLACKWOOD, J.:

While concurring in the affirmation of judgment in the above-entitled cause, upon the finding of the jury in the court below, and the plea in abatement that Sandoval was a citizen, yet as regards the question of Mexican citizenship introductorily considered in the elaboration of the opinion of the court, I desire hereby to reserve any differences of opinion from views therein expressed, and doctrines advanced, that future reflection may suggest to my mind. A comparatively slight opportunity having been afforded me in the progress of this cause to examine a subject confessedly of so great importance, and therefore, any investigation of its merits not having been as thorough as I could wish, I deem this reservation proper and necessary in the premises.